FILED'07 DEC 11 12:39USDC-ORM

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

WILLIAM M. BORJA,                                    CV. 06-1266-CL
                    Plaintiff,

v.                                                   REPORT AND
                                                     RECOMMENDATION

MICHAEL J. ASTRUE,
Commissioner of Social Security,
                    Defendant.
_____

CLARKE, Magistrate Judge:

## INTRODUCTION

Plaintiff William Borja brings this action for judicial review of a final decision of the

Commissioner of the Social Security Administration ("Commissioner") denying his application

for Social Security disability insurance benefits ("DIB") under Title II of the Social Security Act.

This court has jurisdiction under 42 U.S.C. § 405(g).  For the reasons set forth below, this court

recommends that the Commissioner's final decision be reversed and remanded for the calculation

and award of benefits.

BACKGROUND

Borja was nearly 42 years old on the date of the hearing.  He received a GED and completed vocational, on-the-job training in fire management from the U.S. Forest Service.  He worked in the past as a wildlands firefighter/forestry technician, a mill worker, a dock worker, and a driver and parts runner for a construction company.  Tr. 16, 376.[1]  He last worked in June 2003, for less than three months.

Borja alleges disability due to pain in his neck and back from multiple spinal surgeries including implants, eating and sleeping disorders, migraine headaches, and mental problems.  Tr. 78, 375.  He alleges these conditions cause the following symptoms:  inability to concentrate, reason or retain information, inability to sit, stand or walk for long periods of time, limited movement, limiting lifting ability, neck and lower back pain, migraine headaches twice per week, inability to leave the house due to headache pain, and the need to rest during the day.  Tr. 78, 108, 110, 375.

Borja alleges he cannot work because of his combined physical and mental  impairments, and that he ultimately stopped working because his employer told him he was not productive enough and they could not find enough work for him to do with his limitations.  Tr. 375, 798.  He also testified that by June 2003, the last time he tried to work, he no longer could lift heavy items, he had difficulties talking on the radio and understanding instructions over the radio, he had difficulties reading maps, and that he had never had difficulties with any of those activities when he was in good health.  Tr. 798-800.

---

[1] Citations are to the page(s) indicated in the official transcript of the administrative record filed with the Commissioner's Answer.

Borja filed an application for DIB benefits on October 22, 2001, alleging disability

beginning September 12, 2000.  His date last insured was September 30, 2001.  Borja's

application was denied initially and upon reconsideration.  On February 10, 2003, a hearing was

held before an Administrative Law Judge ("ALJ").  In a decision dated April 15, 2003, the ALJ

found Borja not disabled and therefore not entitled to benefits.  The Appeals Council denied

Borja's request for review, and Borja filed suit in district court.  On July 5, 2005, the parties

stipulated to a remand to the agency for further administrative proceedings.  Tr. 336-37.  On

August 22, 2005, the Appeals Council remanded the case to a new ALJ with orders to adequately

evaluate medical opinions of treating physicians and a treating psychologist.  Tr. 340-41.  A

second hearing was held on January 25, 2006, and in a decision dated May 24, 2006, the ALJ

found Borja not disabled.  The Appeals Council denied Borja's request for review and this appeal

ensued.

## STANDARDS

A claimant is disabled if he or she is unable to "engage in any substantial gainful activity

by reason of any medically determinable physical or mental impairment which . . . has lasted or

can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §

423(d)(1)(A).  The initial burden of proof rests upon the claimant to establish his or her

disability.  Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122

(1996).  The Commissioner bears the burden of developing the record.  DeLorme v. Sullivan,

924 F.2d 841, 849 (9th Cir. 1991).

The district court must affirm the Commissioner's decision if it is based on proper legal

standards and the findings are supported by substantial evidence in the record as a whole.  42

U.S.C. § 405(g); see also Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).  "Substantial

evidence means more than a mere scintilla but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion."  Andrews, 53

F.3d at 1039 (citation omitted).  The court must weigh all of the evidence, whether it supports or

detracts from the Commissioner's decision.  Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir.

1986).

MEDICAL RECORDS

The medical records accurately set forth Borja's medical history as it relates to his claim.

The court has carefully reviewed the records, and the parties are familiar with them.

Accordingly, only a brief summary appears below.

Borja has a long history of spinal problems.  In January 2000, he was diagnosed with a

right L5-S1 herniated nucleus pulposus (herniated/protruding disc) as a result of a work injury

and surgery was performed in the form of a right L5-S1 hemilaminotomy and microdiskectomy.

Tr. 251-52.  Borja  recovered but a permanent lifting and carrying restriction was assessed by his

treating physician.  Tr. 188.  Borja was in a motor vehicle accident at work in September 2000

which may have exacerbated his symptoms.  Tr. 185.  An x-ray showed degenerative disc disease

at C5-6 in September 2000 and Borja experienced ongoing neck pain and left buttock pain in

spite of a course of physical therapy.  Tr. 154, 184.  An MRI of his lumbar spine in October 2000

showed degenerative and post-surgical changes at L5-S1 with mild to moderate stenoses of the

lateral recesses.  Tr. 153.  Borja continued experiencing neck and low back pain, and some

evidence of C7 radiculopathy was found in November 2000.  Tr. 180-81.  An MRI of the cervical

spine in December 2000 showed a disc protrusion at C2-3, a bulge at C3-4, a disc protrusion with

some narrowing at C4-5, canal stenosis with bilateral foraminal narrowing at C5-6, and a bulge at C6-7. Tr. 152. The conclusion of that MRI was spondylitic changes most evident at C4-5 and at C5-6. Id. Borja's chronic back pain continued, and his physician noted a worsening C6 radiculopathy in December 2000. Tr. 176-77.

Borja was evaluated by Dr. Fuller, an orthopedic surgeon, in December 2000 who assessed cervical degenerative disc disease, soft disc herniation at C4-5, degenerative discopathy/herniation at L5-S1 that was resolved and stationary, and ongoing depression. Tr. 205-16. In January 2001, Dr. Calhoun performed surgery to treat Borja's left C4-5 herniated disc and bilateral C5-6 spondylosis and stenosis which was causing severe, progressive left arm pain and profound left C5 radiculopathy. The surgery was a C4-5 and C5-6 anterior cervical diskectomy and interbody fusion that included a plate and screws. Tr. 156-57. Borja reported chronic neck discomfort in the months following this surgery, and physical therapy was not helpful. Tr. 144, 170. In March 2001, Borja was advised by Dr. Calhoun that he could not return to his previous job that included driving and lifting. Tr. 172. X-rays of his cervical spine in April and June 2001 were normal, but his physician opined that he still could not return to his previous job and that when he did return to work, he would likely have numerous limitations. Tr. 169. Borja's neck pain worsened in July 2001 and he was referred back to physical therapy, found not medically stationary and not released to light work duty, and his physician opined that vocational rehabilitation would be necessary. Tr. 166. Borja was released to work in October 2001 with limitations on reaching, bending, squatting and climbing stairs related to his C4-5 disk herniation. Tr. 163-64.

An MRI of Borja's cervical spine was performed in July 2002 in response to complaints

of neck pain radiating down his arms and into his head.  The MRI showed degenerative disc

disease at C2-3, C3-4, and C6-7.  Central canal narrowing was most marked at C3-4 and C6-7.

Neural foraminal narrowing was most marked at C6-7.  Tr. 525-26.  In September 2003, Dr.

Gideonse filled out a report that found significant physical limitations for Borja, and diagnosed

discogenic neck and back disease with a poor prognosis and expectation that the condition was

permanent.  Tr. 455-56.  In November 2005, Dr. Gideonse noted a mild increase in bilateral

numbness and tingling in Borja's forearms, that his chronic pain was responding to medication,

and that his depressive disorder was stable on medication.  Tr. 738-39.

Borja had a long history of headaches and migraines.  A head CT scan in March 2002 was

normal.  Tr. 524.  Borja had a neurological consultation with Dr. Taylor in April 2002 which

found that he experienced chronic tension headaches secondary to his cervical neck injury and

surgery, migraine headaches secondary to a motor vehicle accident and the cervical surgery

following the accident, depression related to chronic pain, and forgetfulness due to chronic pain

and depression.  Tr. 461-63.  Dr. Taylor recommended changing and increasing his medication,

and a referral in the future to a pain management specialist.  Id. at 463.  Borja continued to see

Dr. Taylor for persistent neck pain, headaches and depression.  In October 2003, Dr. Taylor

diagnosed chronic cervical pain due to chronic radiculopathy and migraines, and opined that

Borja's neck injury and neck pain made him incapable of sustained work activity.  Tr. 459.

In October 2003, Borja was referred to Dr. Kim, a pain management specialist.  Dr. Kim

noted that Borja appeared very uncomfortable, that his gait was slightly antalgic with shortened

steps, and that his head and neck were tender on palpation.  Dr. Kim diagnosed chronic

migraines, chronic tension headaches, and sacroiliitis.  Dr. Kim recommended changing Borja's

medications to treat his pain and headaches, and also injecting his sacroiliac joints with steroids. Tr. 471-73. In November 2003, Dr. Kim noted that the steroid injections were helpful but Borja still had neck pain, and added the diagnosis of depression. Tr. 457-58. Dr. Kim assessed Borja with significant physical limitations, noted that Borja was affected by both physical and psychological limitations, and that Borja's medications also limited what he could do. Tr. 452-53. In December 2003, Dr. Kim noted that Borja's pain level had improved in some areas but that he still had migraines. Tr. 479-81. Dr. Kim also reviewed the July 2002 MRI of Borja's neck and wrote that he suspected Borja had some facet degenerative disease, and would schedule cervical facet joint injections of C2-3 and C3-4. Tr. 480. In March 2004, Borja's headaches, neck pain and migraine frequency worsened, and he experienced panic attacks and an altercation at his daughter's school. Tr. 490-93.

Borja was treated by a number of mental health physicians. Borja received a psychiatric assessment from Dr. Benson in July 2001 which found significant depression. Tr. 219-22. The psychiatrist also noted that he may have reading difficulties, he walked with a stiff gait and had rigid posture, and that his pain syndrome and family problems likely exacerbated his depression. Tr. 221. The psychiatrist also noted that while the MMPI-2 profile was invalid, he did not believe that Borja was exaggerating or manufacturing his symptoms, but that Borja's depression severely distorted his perception of himself and his ability to function. Id. Borja continued under Dr. Benson psychiatric care in the following years and chart notes indicated that Borja was diagnosed with anger control, fatigue, sleep disturbance including nightmares, anxiety, panic attacks depression, persistent migraines and persistent pain. Dr. Benson noted in April 2002 that Borja complained of having difficulty holding small objects. Tr. 699. In June 2003, Dr. Benson

diagnosed a major depressive disorder and chronic pain, and opined that Borja was not capable

of working on a consistent basis because of a combination of depression and chronic pain. Tr.

467-69.  Dr. Benson filled out a Mental Status Report in August 2003 which assessed moderate,

recurrent major depression, pain disorder due to neck injury, and difficulties in concentration,

persistence and pace. Tr. 685-87.

Borja received a psychiatric evaluation from Dr. Ruminson in December 2001 which

found a major depressive disorder of moderate severity, chronic pain secondary to back and neck

injuries with surgeries, a GAF of 50, and a recommendation of medication and continued

psychotherapy with Dr. Benson. Tr. 254-57.  Borja continued to see Dr. Ruminson who

prescribed various medications. In June 2002, Borja's wife called the police when he allegedly

locked himself in a bathroom with a gun and threatened to kill himself. The police subdued

Borja with beanbag rounds and placed him in the hospital with a psychiatric hold based on their

belief that he was a danger to himself. Tr. 362-73.  Dr. Ruminson's assessed Borja on discharge

from the hospital and found the following:  moderately severe major depressive disorder with

active suicidal thinking on admission, a personality disorder NOS, chronic pain due to disc

disease and surgery, and a GAF of 25 on admission and 60 on discharge. Tr. 521-23.  In

December 2002, Dr. Ruminson noted that pain was still very limiting, and that Borja was having

trouble sleeping. Tr. 663.  In June 2003, Dr. Ruminson diagnosed Borja with a major depressive

disorder and found him not capable of employment due to depression in combination with disc

herniation and pain. Tr. 449-51.  Dr. Ruminson noted in July 2003 that Borja attempted to return

to work but was not successful. Tr. 663.  In July 2004, Dr. Gideonse assessed several marked

and moderate limitations regarding Borja's mental impairments, and noted that he was unable to

Page 8 - REPORT AND RECOMMENDATION

sustain normal work activities due to spinal and neck injuries that caused his limitations. Tr.

527-30. Borja was treated with a number of medications including Amidrine, Imitrex,

Celexa/Citalopram, Amitriptyline, Neurontin, Vicodin, Piroxicam, Flexeril/Cyclobenzaprine, and

steroid injections. Borja reported that medication gave him inconsistent relief from his ongoing

physical and mental conditions.

DISABILITY ANALYSIS

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is

disabled within the meaning of the Act. 20 C.F.R. §§ 404.1520, 416.920. Below is a summary

of the five steps, which also are described in Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir.

1999):

Step One. The ALJ determines whether claimant is engaged in substantial gainful

activity. If so, claimant is not disabled. If claimant is not engaged in substantial gainful activity,

the ALJ proceeds to evaluate claimant's case under step two. 20 C.F.R. §§ 404.1520(b),

416.920(b).

Step Two. The ALJ determines whether claimant has one or more severe impairments

significantly limiting him from performing basic work activities. If not, the claimant is not

disabled. If claimant has a severe impairment, the Commissioner proceeds to evaluate claimant's

case under step three. 20 C.F.R. §§ 404.1520(c), 416.920(c).

Step Three. The ALJ next determines whether claimant's impairment "meets or equals"

one of the impairments listed in the Social Security Administration ("SSA") regulations found at

20 C.F.R. Part 404, Subpart P, Appendix 1. If so, claimant is disabled. If claimant's impairment

does not meet or equal one listed in the regulations, the ALJ's evaluation of claimant's case

proceeds under step four.  20 C.F.R. §§ 404.1520(d), 416.920(d).

Step Four.  The ALJ determines whether claimant has sufficient residual functional

capacity ("RFC") despite the impairment or various impairments to perform work he or she has

done in the past.  If so, claimant is not disabled.  If claimant demonstrates he or she cannot do

work performed in the past, the ALJ's evaluation of claimant's case proceeds under step five.  20

C.F.R. §§ 404.1520(e), 416.920(e).

Step Five.  The ALJ determines whether claimant is able to do any other work.  If not,

claimant is disabled.  If the ALJ finds claimant is able to do other work, the ALJ must show a

significant number of jobs exist in the national economy that claimant can do.  The ALJ may

satisfy this burden through the testimony of a vocational expert ("VE") or by reference to the

Medical-Vocational Guidelines found at 20 C.F.R. Part 404, Subpart P, Appendix 2.  If the ALJ

demonstrates a significant number of jobs exist in the national economy that claimant can do,

claimant is not disabled.  If the ALJ does not meet this burden, claimant is disabled.  20 C.F.R.

§§ 404.1520(f)(1), 416.920(f)(1).

At steps one through four, the burden of proof is on the claimant.  Tackett, 180 F.3d at

1098.  At step five, the burden shifts to the ALJ to show that the claimant can perform jobs that

exist in significant numbers in the national economy.  Id.

THE ALJ'S FINDINGS

At step one, the ALJ found that Borja had not engaged in substantial gainful activity at

any time relevant to this decision.  Tr. 16.  This finding is not in dispute.  At step two, the ALJ

found that Borja had the following severe impairments:  status-post right L5-S1 hemilaminotomy

and microdiscectomy, degenerative disc disease of the cervical spine with left C4-5 herniated

nucleus pulposus and bilateral spondylosis at C5-6.[2]  Tr. 17.  This finding is not in dispute.  At

step three, the ALJ found that Borja's impairments were not severe enough to meet or medically

equal any of the listed impairments of 20 C.F.R. Subpart P, Appendix 1.  Tr. 17.  This finding is

in dispute.

    Next, the ALJ found that Borja retained the residual functional capacity to perform light

exertion work with the following limitations:  lift and carry twenty pounds occasionally and ten

pounds frequently; sit, stand and walk for six hours in an eight-hour workday with an option to

change positions  at least once every two hours; and a push-pull limitation that equals the weight

his can lift and carry.  The ALJ also found that Borja could occasionally stoop, crouch and crawl,

that he was limited in reaching in all directions including overhead, that he could never climb

ropes, ladders or scaffolds, and that he could not work around hazards.  The ALJ also found non-

exertional limitations:  Borja was limited to simple, routine, 1-2-3 step work, and no primary

work contact with the general public.  Tr. 28, 30.  This RFC finding is in dispute.  At step four,

the ALJ found that Borja could not perform his past relevant work.  Tr. 29.  This finding is not in

dispute.  At step five, relying on the testimony of a vocational expert ("VE"), the ALJ found that

Borja could work as a small products assembler, a motel cleaner/housekeeper, and a

cleaner/polisher.  Tr. 29.  This finding is in dispute.

DISCUSSION

    Borja contends the ALJ erred by:  (1) improperly evaluating medical evidence; (2)

---

    [2] The record is not clear as to whether the ALJ found headaches and depression severe
impairments at step two.  See Tr. 17 (Directly following the list of severe impairments assessed
by the ALJ at step two, the ALJ wrote: "Headaches secondary to spine disorders and depression,
secondary to pain.").  The ALJ did proceed to analyze the effects of headaches and depression on
Borja's ability to work.

improperly rejecting Borja's symptom testimony; (3) making an unsupported finding at step three

that Borja did not meet a listing; and (4) making a finding at step five that relied on an invalid

RFC. Because the first two issues are dispositive, the second two issues need not be addressed.

Evaluation of Medical Evidence

Borja contends the ALJ selectively disregarded medical evidence. Specifically, the ALJ

gave little weight to the opinions of Dr. Benson, Dr. Taylor, Dr. Ruminson, Dr. Kim and Dr.

Gideonse. In the Ninth Circuit, "where [a] treating doctor's opinion is not contradicted by

another doctor, it may be rejected only for 'clear and convincing' reasons." Lester v. Chater, 81

F.3d 821, 830, (9th Cir. 1995), quoting Baxter v. Sullivan, 923 F.2d 1391, 1396 (9th Cir. 1991).

"Clear and convincing reasons" are also required to reject the treating doctor's ultimate

conclusions. Id., citing Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988). If a treating

physician's opinion is contradicted by that of another physician, specific and legitimate reasons

supported by substantial evidence in the record are required to reject the treating physician's

opinion. Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); Holohan v. Massanari, 246 F.3d

1195, 1202 (9th Cir. 2001). If a treating physician's medical opinion is supported by medically

acceptable diagnostic techniques and is not inconsistent with other substantial evidence in the

record, the treating physician's opinion is given controlling weight. Holohan, 246 F.3d at 1202;

20 C.F.R. § 404.1527(d)(2); SSR 96-2p. Where the Commissioner fails to provide adequate

reasons for rejecting the opinion of a treating or examining physician, the court credits that

opinion as a matter of law. Lester, 81 F.3d at 834.

Dr. Jon Benson, Psy. D., performed a comprehensive psychological assessment of Borja

in July 2001, and then became a treating physician, seeing Borja on a regular basis for sixty-

minute therapy sessions from October 2001 through May 2004. The ALJ disregarded much of Dr. Benson's assessment. This was error. The ALJ erred factually when he wrote that Dr. Benson saw Borja only three times subsequent to the July 2001 evaluation. Tr. 20. In fact, the record shows that Dr. Benson saw Borja on a much more frequent basis, approximately thirty times in three years. See Tr. 223-30, 502-03, 675-701. The ALJ also wrote that Dr. Benson diagnosed depression and pain. Tr. 20. In fact, the record shows that Dr. Benson diagnosed ongoing depression, physical pain, anger control problems, anxiety, sleep disturbance, and concentration problems. Dr. Benson opined in June 2003 that the combination of Borja's major depressive disorder and chronic pain prevent him from being able to work and, in July 2004, he opined that Borja had limitations in sustaining concentration and persistence, in social interactions, and in the ability to make adaptations. In discrediting Dr. Benson's assessments, the ALJ wrote that the limitations assessed by Dr. Benson were contradicted by Borja's ability to care for his daughter, perform daily activities including handling finances, attend medical appointments, and work full-time for three months. Tr. 27. None of these reasons are sufficient to question the opinion of a treating physician. The record shows that Borja did not care for his daughter independently but that she was often cared for by her mother and her grandmother, and that Borja's daily activities were limited and caused him pain. Borja's physicians should not be discredited, nor should Borja be penalized, for attending medical appointments and attempting to work for three months.[3] See Lester, 81 F.3d at 833 (noting that a claimant can have occasional symptom-free periods, including the sporadic ability to work, and still be disabled). Dr.

---

[3] The record shows that Borja's attempt to work was unsuccessful because he was not able to lift heavy items on an ongoing basis, and his employer could not find enough work for him to do with his physical limitations. Tr. 375, 798.

Page 13 - REPORT AND RECOMMENDATION

Benson's diagnoses were based on objective evidence in the form of psychiatric testing and ongoing psychiatric therapy. The ALJ did not rely on other medical opinions in the record in discrediting Dr. Benson, nor did he provide the required clear and convincing reasons for rejecting the opinion of this treating physician. The ALJ erred in discrediting Dr. Benson.

Dr. Glenn Ruminson, M.D., performed a psychiatric evaluation of Borja in December 2001, and then became a treating physician, seeing Borja on a regular basis between June 2002 and September 2003. In June 2003, Dr. Ruminson opined that Borja's major depressive disorder combined with limitations due to physical pain made him incapable of performing substantial gainful work activity. Tr. 450. The ALJ recited many of Dr. Ruminson's findings regarding Borja, but discredited Dr. Ruminson without providing the required clear and convincing reasons for failing to credit the opinion of a treating physician. The ALJ erred factually when he wrote that Dr. Ruminson only diagnosed Borja with major depressive disorder secondary to pain. Tr. 21. In fact, the record shows that in addition to a major depressive disorder, Dr. Ruminson diagnosed chronic pain, a personality disorder NOS, and prescribed a number of prescription drugs to treat Borja's depression, pain, and sleep problems. Finally, the ALJ discredits Dr. Ruminson by inferring that Dr. Ruminson's diagnoses relied on Borja's incredible allegations of pain, and that "Dr. Ruminson seems to have forgotten Dr. Benson's observation that the claimant is somatically focused regarding his alleged pain and limitations." Tr. 21. The ALJ erred in selectively quoting from Dr. Benson's psychological evaluation of Borja to discredit Dr. Ruminson's opinion. Dr. Benson did analyze Borja as being preoccupied with his physical functioning, but Dr. Benson also diagnosed significant depression and pain syndrome, and concluded that Borja was not "exaggerating or manufacturing his symptoms". Tr. 221. In fact,

Page 14 - REPORT AND RECOMMENDATION

none of Borja's treating physicians opined that Borja was malingering or that his pain and the limitations caused by that pain were not legitimate. The ALJ erred in failing to give proper weight to the opinion of treating physician Dr. Ruminson. As treating mental health physicians, the opinions of Dr. Benson and Dr. Taylor supported Borja's allegations of limitations caused by his mental condition.

Neurologist Howard S. Taylor, M.D., performed a neurological consultation in April 2002, and then became a treating physician, seeing Borja a number of times until October 2003. Dr. Taylor diagnosed chronic cervical pain due to chronic cervical radiculopathy, migraine headaches, and prescribed medication to treat these conditions. Tr. 459. In October 2003, Dr. Taylor opined that due to Borja's neck injuries and chronic neck pain, Borja was not capable of sustained work activity. Id. Dr. Taylor found that Borja should be limited to lifting and carrying not more than ten pounds, standing, walking and sitting for no more than one hour in an eight-hour workday, and no crouching or crawling. Id. The ALJ wrote: "I give Dr. Taylor's letter of October 2003 no weight because he flatly declares the claimant can 'not work.'" Tr. 26. In fact, the record shows that Dr. Taylor did not use those words at all but instead opined that Borja was "incapable of performing any sustained work activity." Tr. 459. The ALJ erred in failing to accord any weight to Dr. Taylor's opinion. While the ALJ noted correctly that the ultimate issue of disability is reserved to the Commissioner, the ALJ failed to offer the required clear and convincing reasons for discrediting Dr. Taylor's opinion that Borja's severe impairments would make him incapable of sustaining employment. In evaluating whether a claimant satisfies the disability criteria, the ALJ must evaluate the claimant's ability to work on a sustained basis. 20 C.F.R. § 404.1512(a); see also Lester, 81 F.3d at 833. The ALJ also erred factually when he

noted that Dr. Taylor only saw Borja over the course of six months.  Tr. 26.  In fact, the record

shows that Dr. Taylor saw Borja over the course of nineteen months.  See Tr. 461-63 (first

evaluation in April 2002);  Tr. 460 (last visit in October 2003).  Overall, the ALJ attempts to

portray Dr. Taylor as being mislead by Borja's subjective reports, particularly Borja's report of

his psychiatric hospitalization in June 2002.  Tr. 26.  However, the record shows that Dr. Taylor

saw Borja during his stay in the psychiatric hospital after the police admitted him, and that Dr.

Taylor was involved in prescribing medication for Borja in the hospital.  Tr. 465.  Thus it seems

unlikely that Dr. Taylor was unaware of the circumstances that caused Borja's psychiatric hold

by police, or that Dr. Taylor was mislead regarding the actual circumstances leading up to the

hospitalization.  Finally, the ALJ wrote the following in discrediting Dr. Taylor's opinion:  "If

(Borja) can throw tantrums and items while terrorizing others then he clearly has the physical

capacity to perform at least light exertion level."  Tr. 26.  In addition to being nonsensical, this

medical and vocational conclusion by the ALJ is not supported by the opinions of other treating

physicians, nor does it form a logical conclusion regarding Dr. Taylor's opinion of Borja's

physical limitations.  Because the ALJ failed to provide clear and convincing reasons for

rejecting the opinion of Dr. Taylor, the ALJ's finding regarding this treating physician should be

given no weight.

Nicholas Gideonse, M.D., was one of Borja's treating physician from September 2002

through January 2006, when the record closed.  Dr. Gideonse diagnosed migraine headaches,

cervical disk disease, discogenic neck and back pain, anxiety, and depression for which he

prescribed medications.  In July 2004, Dr. Gideonse assessed Borja with many marked and

moderate limitations in understanding and memory, sustained concentration and persistence,

social interaction and the ability to make adaptations.  Tr. 527-30.  Dr. Gideonse opined that the

combination of Borja's physical impairments and pain made Borja unable to sustain normal work

activities.  Tr. 530.  The ALJ did not discuss Dr. Gideonse's ongoing treatment of Borja.  The

ALJ discredited Dr. Gideonse's assessment of Borja's mental capacity by noting that Dr.

Gideonse was not a psychiatrist, that his mental assessment was not consistent with other

medical evidence, and that Dr. Gideonse's more recent notes reflected an improvement in Borja's

mental condition.  Tr. 25.  While the ALJ may rely on other medical evidence to discredit a

treating physician, the ALJ must read a physician's statement in the context of overall diagnostic

picture such that some improvement does not mean Borja's impairments no longer seriously

affected his ability to function in the workplace.  Holohan, 246 F.3d at 1205.  Overall, the ALJ

discredited much of Dr. Gideonse's opinion with little discussion.  This was error.

James Y. Kim, M.D., a pain relief specialist, began treating Borja in October 2003 based

on referrals from several of Borja's treating physician.  Dr. Kim treated Borja a number of times

between October 2003 and May 2004, including steroid injections into Borja's joints, injectable

Imitrex and other medication to treat migraines, various pain medications, sleep medications, and

medication for anxiety and a mood disorder.  In November 2003, Dr. Kim assessed a number of

limitations for Borja, including lifting, sitting, standing or walking, reaching and various other

limitations.  Tr. 452-53.  Dr. Kim also diagnosed chronic tension headaches, sacroiliitis, and

cervical degenerative disc disease, opined that Borja was affected both physically and

psychologically, and that the medications Borja needed to take also limited the complexity and

risk of the jobs he could handle.  Id.  The ALJ found Dr. Kim's evaluation deserved "little

weight" because it was a form sent by Borja's attorney, and because Dr. Kim's treatment notes

Page 17 - REPORT AND RECOMMENDATION

"say very little". This court disagrees with the ALJ's assessment. First, the mere fact that a medical report is provided at the request of counsel is not a legitimate basis for evaluating the reliability of the report. Reddick, 157 F.3d at 725. Also, the record evidence shows that Dr. Kim's treatment notes were sufficiently detailed to support his overall assessment of Borja's impairments. See, e.g., Tr. 471-473 (detailed chart notes for examination of October 31, 2003); Tr. 479-481 (detailed chart notes for examination of June 3, 2004, including review and discussion of Borja's MRI results). The ALJ provided insufficient reasons for discrediting the opinion of treating physician Dr. Kim.

Finally, this court notes the ALJ's wholesale rejection of several forms filled out by Borja's treating physicians, Drs. Gideonse, Benson and Ruminson. Tr. 27. While the ALJ notes that the record, in fact, contains discussions by those physicians of their treatment of Borja and contemporaneous notes in which they actually discuss Borja's limits in the context of their care, the ALJ nevertheless accords "no weight" to these forms and cites three Ninth Circuit cases to support his conclusion that the opinions expressed by those physicians may be disregarded in their entirety. However, none of the cases cited by the ALJ is on point. In Young v. Heckler, 803 F.2d 963, 964 (9th Cir. 1986), the disputed form was the only medical evidence that declared the claimant to be entirely disabled, the doctor who filled out that form provided inconsistent information on the form, and the form was inconsistent with that doctor's earlier assessments of the claimant. Here, many of Borja's physicians opined that he was incapable of sustained employment, the forms the physicians filled out did not contain inconsistent information as to Borja's condition, and earlier assessments by these three physicians were consistent with the forms the ALJ rejected. In Crane v. Shalala, 76 F.3d 251, 253 (9th Cir. 1996), the ALJ's rejection

of three check-off reports was deemed permissible because the ALJ could not discern any explanations for the conclusions the physicians made in their reports. Here, all three physicians were Borja's treating physicians who kept detailed patient notes and reports such that the record contains sufficient medical evidence to explain their individual determinations and conclusions regarding Borja's condition. In Tidwell v. Apfel, 161 F.3d 599, 602 (9th Cir. 1998), the ALJ found that a check-the-box form indicating disability was not supported by the physician's chart notes, and that other contradictory medical evidence supported the ALJ's determination that the form was inadequate. Here, the chart notes submitted by the three doctors in question support their conclusions as to Borja's limitations, and the ALJ here did not point to any medical evidence in the record that specifically contradicts the opinions of these three treating physicians. The ALJ failed to provide adequate reasons for according no weight to the forms filled out by Drs. Benson, Gideonse and Ruminson with their opinions regarding Borja's limitations and ability to sustain employment.

Where the Commissioner, here represented by the ALJ, fails to provide adequate reasons for rejecting the opinion of a treating physician, the court credits that opinion as a matter of law. Lester, 81 F.3d at 834. This court recommends that the medical opinions of Borja's treating physicians be credited as a matter of law.

Borja's Symptom Testimony

Borja contends the ALJ wrongly rejected his testimony as to his symptoms in finding Borja's alleged limitations not wholly credible. If there is medical evidence of an underlying impairment, the ALJ may not discredit a claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence. See Bunnell v. Sullivan,

947 F.2d 341, 347-48 (9th Cir. 1991) (en banc).  "Unless there is affirmative evidence showing

that the claimant is malingering, the Commissioner's reasons for rejecting the claimant's

testimony must be 'clear and convincing.'"  Lester, 81 F.3d at 834 (9th Cir. 1995).  "General

findings are insufficient; rather, the ALJ must identify what testimony is not credible and what

evidence undermines the claimant's complaints."  Id.  In weighing a claimant's credibility, the

ALJ may consider his reputation for truthfulness, inconsistencies either in his testimony or

between his testimony and his conduct, his daily activities, his work record, and testimony from

physicians and third parties concerning the nature, severity, and effect of the symptoms of which

he complains.  Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996) (citations omitted).

     The ALJ questioned Borja's credibility on a number of levels.  First, with regard to

headaches, the ALJ wrote that Borja did not complain of headaches to Dr. Calhoun or to physical

therapists after his cervical spine surgery in January 2001.  Tr. 17.  However, Borja complained

of headaches to many other physicians throughout the record following this second spinal

surgery.  See, e.g., Tr. 224 (November 2001); Tr. 254-57 (December 2001); Tr. 461-63 (April

2002).  Also, no physician opined that Borja's headaches were fabricated or an unlikely result of

his ongoing cervical problems.

     The ALJ wrote that Borja only pursued mental health evaluations and medication

management with "pain specialist Dr. Howard Taylor" between April 2002 and March 18, 2004

as evidence of failure to get treatment for his alleged physical problems.  Tr. 19.  The record

shows that the ALJ erred in this conclusion.  First, Dr. Taylor was a neurologist, not a pain

specialist, and he was qualified to treat Borja's various conditions.  Dr. Taylor treated Borja's

chronic neck problems in August 2002, and treated his neck problems and migraines in October

Page 20 - REPORT AND RECOMMENDATION

2003. Tr. 466, 460. Also, Borja saw many physicians for his various physical problems between

April 2002 and March 2004, including Dr. Ruminson who prescribed medication but specifically

stated that he was not providing pain management in December 2002. Tr. 663. Also, Borja had

already completed physical therapy and no physician recommended surgery or other medical

interventions, leaving pain management as Borja's last option.

The ALJ wrote that Borja's MRI of the cervical-thoracic spines dated July 21, 2002

revealed no changes from previous imaging done by Dr. Calhoun. Tr. 19. However, the record

shows that Dr. Calhoun had never ordered an MRI, only x-rays, and the ALJ's attempt to portray

the MRI as showing nothing serious is disingenuous. In fact, the MRI results showed

degenerative disc disease at C2-3, C3-4, and C6-7, as well as central canal narrowing that was

most marked at C3-4 and C6-7. Tr. 525-26. Neural foraminal narrowing was most marked at

C6-7. Id. On review of this MRI, Dr. Kim noted that Borja's pain from the upper cervical

segments was consistent with the findings, and wrote that he suspected Borja had facet

degenerative diseases as well. Tr. 479-81.

The ALJ noted that Borja had tried to work, that he was lifting fifty pounds multiple

times a day, and that he drew unemployment benefits from January 2002 through February 2003.

Tr. 20, 25, 27. However, as noted above, Borja's attempt to work failed after less than three

months because he was unable to continue lifting large items, and his employer could not find

any tasks that he could accomplish within his limitations. See Lester, 81 F.3d at 833 (noting that

a claimant can have occasional symptom-free periods, including the sporadic ability to work, and

still be disabled). Thus Borja was not capable of sustained work activity under SSA guidelines.

Borja should not be penalized for attempting to work, and the unemployment benefits he

collected were not sufficient to be considered substantial gainful activity.

The ALJ noted that Dr. Ruminson referred Borja to a Dr. McCluskey, a neurologist, but that Borja did not manage to see Dr. McCluskey as of July 2003 before his insurance ran out. Tr. 21. Although Borja may not have seen Dr. McCluskey specifically, Borja did see another neurologist, Dr. Taylor, beginning in April 2002, and Dr. Kim, a pain management specialist, beginning in October 2003. The fact that Borja did not see the precise specialist recommended by one his physicians is not sufficient grounds to impugn his credibility.

The ALJ wrote that Borja had gone without pain management medications since a month after last seeing Dr. Taylor on May 23, 2002, until he began seeing Dr. Kim in October 2003, as evidence that Borja was not in chronic pain. Tr. 21. The ALJ erred factually in making this conclusion. The record shows that other physicians prescribed pain medication for Borja including Dr. Ruminson in June and August 2002, and Dr. Gideonse in September 2003. Tr. 665, 664, 534.

The ALJ wrote that Borja frequently was non-compliant in taking his anti-depressant medication. Tr. 22-23. While Borja did discontinue some medication prior to his psychiatric hospitalization, after his breakdown and subsequent hospitalization he complied diligently with prescribed psychotropic medication. Borja discontinued some medications at various times due to lack of funds. An inability to afford treatment or medication may not be used as a reason to deny benefits. See Gamble v. Chater, 68 F.3d 319, 320-21 (9th Cir. 1995). Borja discontinued an anti-depressant at another point during his treatment with his physician's knowledge. Tr. 482-84.

The ALJ wrote that Borja's activities of daily living belied the limitations Borja alleged he experienced as a result of spinal injuries, chronic pain, and mental problems. Tr. 24. The

Page 22 - REPORT AND RECOMMENDATION

ALJ wrote: "Contrary to the claimant's litany of alleged pain and limitations, he nonetheless acknowledged that he 'spends his time looking for work and caring for his 10-year-old daughter.'" Tr. 25. Borja and his mother both testified that Borja is not able to maintain a home or care for his child without assistance. With regard to his daily activities, this court notes that some limited level of activity is not fatal to Borja's assertion of disability. See Vertigan v. Halter, 260 F.3d 1044, 1050 (9th Cir. 2001) (claimant does not need to be "utterly incapacitated" to be considered disabled). As Ninth Circuit cases have explained, the ability to cook meals, wash dishes, and engage in restricted travel are not necessarily inconsistent with disability in that "many home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication." See Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989) (collecting other cases). Disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations. Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998). None of the activities cited by the ALJ are inconsistent with the limitations Borja alleges.

The ALJ wrote that Borja consistently alleged "an inability to use his arms and legs." Tr. 25. The ALJ points out that this inability was belied by Borja's report to a physician in June 2002 that he had no numbness in his arms and legs. Id. However, the ALJ misstates the record and quotes it selectively. First, Borja alleged ongoing chronic pain in his arms and legs, not an inability to use them. And the physician's report from June 2002 that the ALJ quotes was an emergency room report in which Borja was being questioned as to the effect of the injuries he sustained from the beanbag rounds used on him by police. Following the physician's note that Borja did not have numbness in his arms and legs was a note the ALJ omitted that Borja had

chronic neck and back pain, consistent with Borja's ongoing testimony as to the limitations

caused by his neck and back problems.  Tr. 659.  Borja reported bilateral numbness and tingling

in his forearms to other physicians.  See, e.g., Tr. 738-39.

The ALJ wrote that Borja's anger, impression of mistreatment by the worker's

compensation system, and alleged filing of a personal injury suit against the Portland police

regarding his experience being subdued by beanbag rounds detracts from his credibility.  Tr. 27.

The ALJ also noted that Borja had anger outbursts and frightened others.  The court notes that

Borja was diagnosed repeatedly with depression, anxiety, and various other mental disorders.

Given his documented history of mental illness and chronic pain, the ALJ erred in finding these

behaviors detracted from Borja's credibility.

Because this court finds that not one of the grounds upon which the ALJ questioned

Borja's credibility is supported by the record, this court recommends the ALJ's credibility finding

be given no weight.  Borja's testimony as to his symptoms and limitations should be credited as

true as a matter of law.  See Lester, 81 F.3d at 834 (ALJ's improper rejection of claimant's

testimony must lead to crediting that testimony as a matter of law); see also Varney v. Secretary

of HHS, 859 F.2d 1396, 1401 (9th Cir. 1988).  The ALJ found that Borja's multiple spinal

problems were severe impairments for the purpose of determining disability.  Accepting Borja's

testimony as true with regard to the limitations caused by his spinal conditions, headaches

secondary to the spinal disorders and depression secondary to pain, the record shows that he is

unable to perform full-time work and should be found disabled.

Lay Testimony

As a final matter, this court notes that the ALJ failed to consider lay testimony that

Page 24 - REPORT AND RECOMMENDATION

supported Borja's claims. Lay testimony as to a claimant's symptoms is competent evidence which the ALJ must take into account. Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993); 20 C.F.R. §§ 404.1513(d)(4) and (e), 416.913(d)(4) and (e). Where an ALJ disregards lay testimony, he must provide germane reasons for doing so. Dodrill, 12 F.3d at 919. Lay witnesses are competent to testify as to a claimant's symptoms or how an impairment affects the ability to work and therefore "cannot be disregarded without comment." Nguyen v. Chater, 100 F.3d 1462, 1467 (9th Cir. 1996). Here, Borja's mother, Leonora Borja, testified that it takes her son hours to clean one room or mow the lawn, that Borja's daughter must help him put on his shoes and socks, that Borja must be reminded to take medication, that it will often take him two or three times longer than in prior years to do chores and that he often cannot finish chores he starts, and that she and her husband assist Borja with home repairs and shopping. Tr. 415-23. She also testified that headaches, nausea, vomiting and extreme pain keep Borja from doing house and yard work, that pain may cut short a trip to the grocery store when she accompanied Borja, that Borja had trouble keeping track of bill-paying and making financial decisions, that Borja rarely left the house, that Borja had many physical limitations including numbness in his legs if he sat for too long and leg pain from walking too far, that Borja had difficulty following instructions, that Borja had memory problems, and that Ms. Borja had to care for her grand daughter on numerous occasions when her son was not able to do so. Id. The ALJ erred in failing to mention this lay testimony which supports Borja's claims.

CONCLUSION

For the foregoing reasons, the Commissioner's decision should be reversed and remanded pursuant to sentence four of 42 U.S.C. § 405(g) for the calculation and award of benefits.

_This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals._  Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment or appealable order. _Objections to this Report and Recommendation, if any, are due by December 26, 2007.  If objections are filed, any responses to the objections are due 14 days after the objections are filed_.  Failure to timely file objections to any factual determinations of the Magistrate Judge will be considered a waiver of a party's right to de novo consideration of the factual issues and will constitute a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the Magistrate Judge's recommendation.

Dated this _11_ day of December, 2007.

_____
Honorable Mark D. Clarke
United States Magistrate Judge

Page 26 - REPORT AND RECOMMENDATION